Filed 2/14/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041651 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS051124A) |
| v. | |
| ECCLESIASTES PRESLEY, | |
| Defendant and Appellant. | |

Defendant Ecclesiastes Presley appeals from an order revoking his outpatient status pursuant to Penal Code section 1608[1] and directing his confinement in a state hospital.

Presley argues the trial court: (1) unlawfully deprived him of his right to have a jury decide his commitment status; (2) violated his due process rights by holding the hearings on revoking his outpatient status in his absence; (3) erred by considering inadmissible testimony from his treating psychologist; and (4) revoking his outpatient status without substantial evidence to support its decision.

Though we agree that Presley was improperly deprived of a jury trial, his absconding from outpatient treatment before the trial court ruled on his commitment status forfeited the claim of error. We find no merit to Presley's remaining arguments and will affirm.

---

[1] Unspecified statutory references are to the Penal Code.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Presley, who has been certified as a mentally disordered offender (MDO),[2] was placed into an outpatient conditional release program (CONREP) by court order in August 2013. He was initially housed at a board and care facility, where he was subject to weekly drug screening, group therapy, and individual counseling. After approximately six months, Presley's family asked if he could live in their home during his outpatient treatment program.

After assessing the family's home, CONREP determined it was acceptable. Presley's prescription was transferred to a nearby pharmacy and his mother was placed in charge of monitoring his medication. CONREP visited him at least once a month and stayed in contact with family members to monitor his adjustment. Presley would also take a bus to the CONREP facility for group therapy and twice-monthly drug screening.

In April 2014, the People moved for a hearing to extend Presley's outpatient treatment for one year pursuant to section 1606. The hearing was continued at the request of Presley's counsel on several occasions, but was ultimately set for pretrial conference on July 8, 2014 and court trial on August 15, 2014.

Presley did not appear at the July 8 pretrial conference. At that conference, the court noted that it had received a report from CONREP, dated February 23, 2014, recommending that Presley's outpatient treatment be extended another year. The trial court scheduled another pretrial conference for August 5, 2014, but maintained the August 15 trial date. A second CONREP status report, dated May 16, 2014, was filed with the court on July 10. This May 16 report indicated that Presley continued to meet the criteria of an MDO.

On August 4, the trial court filed a third CONREP status report, dated August 1, 2014. In this report, CONREP recommended that Presley's commitment be terminated,

---

[2] Presley was decertified as an MDO in 2010 but was re-certified as such in 2011.

2

opining that he no longer met the criteria of an MDO. For reasons which are not set forth in the record, the August 15, 2014 hearing was continued to August 29.

Presley appeared at the August 29 hearing along with his counsel. The only witness who testified was CONREP director (and Presley's treating psychologist), Dr. Akira Suzuki. Dr. Suzuki testified that he or a staff member would visit Presley at his family's home once or twice a month and Presley would come to the CONREP board and care facility twice a month for drug testing and group counseling. Presley's mother and Presley were responsible for ensuring he complied with his medication regimen, although Dr. Suzuki would also count Presley's pills when he came for a visit.

Dr. Suzuki was aware that Presley had a history of refusing to take his medications, though Presley had more recently "seemed to have accepted that this [i.e., taking his medications] is something he has to do." On one occasion in February 2014, Presley left the CONREP board and care facility without authorization and was missing for a couple of days. When he returned, Presley said he met a woman he liked and they "decided to go out together." Dr. Suzuki testified he viewed this incident as being part of Presley's "personality," explaining that Presley "had a long history of being resistant to authority."

When asked about Presley's insight into his mental illness, Dr. Suzuki agreed that it was "still limited." Dr. Suzuki testified about an incident which took place in May 2014 where Presley had been in downtown Bakersfield and got into an altercation with someone. Presley said he "talked to somebody[, and] . . . said something," and then was punched in the face so hard he lost consciousness and needed reconstructive surgery. Presley did not know who punched him, and he did not report the attack to the police. Instead, he called his mother who picked him up and took him to the emergency room.

Dr. Suzuki opined that Presley did not "at this point" pose a danger, because his "insight has increased." He admitted that, if Presley were to stop taking his medications, he would have a "resurgence of psychotic symptoms such as hallucinations, and

3

delusions." However, Dr. Suzuki believed that Presley would "continue [his] treatment on a voluntary basis." Dr. Suzuki noted that Presley had even brought his medications with him to the hearing, which "was a pleasant surprise."

After the close of evidence, the People argued that Presley should remain under CONREP's supervision for an additional year. Presley's counsel focused his argument on Dr. Suzuki's opinion that Presley no longer met the criteria of an MDO and thus he should be released from commitment. At a minimum, Dr. Suzuki's opinion required the trial court to schedule a jury trial on whether Presley met the MDO criteria under section 2972.

The trial court invited the parties to submit additional briefing by September 26, 2014, on the effect of Dr. Suzuki's recommendation that Presley be discharged from his commitment. The hearing was continued to October 3, 2014, to consider the matter. In the interim, defense counsel agreed that, pending the trial court's ruling, Presley would remain under CONREP supervision and outpatient treatment pursuant to section 1606.

On September 17, 2014, the People filed a brief essentially conceding that Presley should be discharged based on Dr. Suzuki's opinion that he no longer met the qualifications of an MDO. The People also conceded that, although the issue was moot, pursuant to section 2972.1, Presley would have been entitled to a jury trial on his MDO status. Defense counsel did not submit any further briefing as he believed it unnecessary in light of the prosecution's concessions.

On October 2, 2014, Dr. Suzuki wrote to the trial court requesting that it revoke Presley's outpatient status because he had "gone AWOL" on or about September 23, 2014. Presley had not made contact with anyone at CONREP, had left his medications at his mother's home and, according to his mother, had reunited with his girlfriend, "the victim of the prior [domestic violence] conviction." According to Dr. Suzuki, Presley's mother discovered Presley's girlfriend abusing drugs, asked her to leave and Presley left with her. The People immediately filed a request for hearing pursuant to section 1608.

4

On October 3, 2014, the trial court revoked Presley's outpatient status, issued a bench warrant based on his failure to appear and set an evidentiary hearing for October 15, 2014. The trial court expressly indicated it was not making a ruling on whether or not to extend Presley's outpatient status under section 1606 as had been originally contemplated at the August 29 hearing.

On October 15, 2014, Presley did not appear at the hearing, although his counsel was present. His counsel objected that the trial court, having revoked Presley's outpatient status on October 3, no longer had jurisdiction to hold a subsequent hearing. He further objected to the hearing on the ground that Presley had not been located and had no formal notice of the hearing and proceeding in his absence would violate his right to procedural due process as well as his right to confront adverse witnesses.

The trial court observed that, pursuant to section 1608, it was required to hold a hearing within 15 judicial days to approve or disapprove a request to revoke outpatient status. As to Presley's absence, the trial court noted "the statute [i.e., section 1608] does not say that the defendant must be present[,] [a]nd in fact, given . . . everyone's attempts to get the defendant here . . . [it] would be appropriate to state that the defendant has voluntarily made himself absent from these proceedings by having left the CONREP situation and having not been in contact with anyone to update himself on the status of the process."

As before, the only witness to testify was Dr. Suzuki. Dr. Suzuki said that he received a telephone call from Presley's mother on September 29, 2014, informing him that Presley had left the house three or four days prior. Dr. Suzuki went to her house to investigate and take possession of Presley's prescription medications, at which point he discovered that Presley had not renewed his antipsychotic prescription for the month of September. Dr. Suzuki was concerned about the risk that Presley would become violent if he did not take his medications. Presley was also required to contact the CONREP

5

program once a week, and had not done so in the four weeks prior to Dr. Suzuki notifying the court about his going AWOL.

Presley did go to CONREP at Dr. Suzuki's request on October 6, 2014 and provided a urine sample. Dr. Suzuki asked the staff to tell Presley to return the following day so they could talk, but Presley did not do so. Presley called Dr. Suzuki on October 10, 2014 and Dr. Suzuki asked him to stop by the following Monday (October 13). Dr. Suzuki advised him there was a hearing scheduled for October 15 and they needed his current address, but Presley did not provide one. Dr. Suzuki also discussed helping Presley make arrangements to travel to Monterey County for the hearing. Presley did not show up for his appointment with Dr. Suzuki on October 13.

On three different occasions, Dr. Suzuki visited the address where Presley was reportedly living, but no one was ever there. Presley's mother seemed to be protective of Presley and told Dr. Suzuki she believed Presley was giving money to his girlfriend to buy drugs rather than helping his mother with rent money.

Following argument by counsel, the trial court revoked Presley's outpatient status under section 1608 and issued a bench warrant. The trial court further ordered that Presley be confined in a state hospital, preferably Metropolitan State Hospital.

According to the record, Presley was arraigned on the bench warrant on November 18, 2014, with the clerk's minutes reflecting that he was to "remain in the custody of the Department of State Hospitals."

## II.   DISCUSSION

### A.   *Presley was entitled to a jury trial but forfeited that right by absconding*

Presley argues that he was unlawfully deprived of a jury trial at the August 29 hearing. We agree Presley was entitled to a jury trial on the question of his commitment status but, because he absconded prior to the trial court rendering a decision, he has forfeited this claim.

6

## 1. Statutory analysis

Questions of statutory interpretation are subject to de novo review. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699.) That review is guided by settled rules, all of which are designed to ascertain the intent of the lawmakers and avoid an interpretation that would lead to absurd consequences. (*Cypress Semiconductor Corp. v. Superior Court* (2008) 163 Cal.App.4th 575, 581.)

We begin with the statutory language, giving the words their usual and ordinary meaning. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.) "If [the statutory language] is clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it." (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047.) We must also "if possible, . . . give effect and significance to every word and phrase of a statute." (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476.) When two provisions touch upon a common subject, "we must construe them 'in reference to each other, so as to "harmonize the two in such a way that no part of either becomes surplusage." ' " (*Ibid.*, quoting *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 778-779.) "We must presume that the Legislature intended 'every word, phrase and provision . . . in a statute . . . to have meaning and to perform a useful function.' " (*Garcia v. McCutchen, supra*, at p. 476, quoting *Clements v. T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233.)

Section 2972.1 sets forth the procedures applicable to MDOs who, like Presley, have received a year of outpatient treatment. At the end of that year, the court is to hold a hearing to determine whether to "discharge the person from commitment under appropriate provisions of law, order the person confined to a treatment facility, or renew its approval of outpatient status." (§ 2972.1, subd. (a).) Prior to the hearing, the community program director is to prepare a report and recommendation which must be provided to "the court, the prosecution, the defense attorney, the medical director of the facility that is treating the person, and *the person* on outpatient status." (*Id.*, subd. (b),

7

italics added.) If the recommendation is that the person either continues on outpatient status or is confined to a treatment facility, the court is to direct defense counsel to meet and confer with the person to explain that recommendation. (*Id*., subd. (c)(1).) Defense counsel and the person must then execute a form indicating that they either: (1) reject the recommendation of continued treatment and demand a jury trial on the question; or (2) accept the recommendation.[3] (*Ibid*.) This form must be returned to the trial court no less than 10 days prior to the hearing. Where the person either requests or fails to waive the right to a jury trial, "a jury trial meeting all of the requirements of Section 2972 shall be set within 60 days of the initial hearing." (§ 2972.1, subd. (d).)

### 2. *Presley's right to jury trial*

We have found no published decisions addressing the jury trial waiver provisions of section 2972.1. In *People v. Blackburn* (2015) 61 Cal.4th 1113 (*Blackburn*), the California Supreme Court examined a related statute, specifically section 2972, and concluded that the MDO defendant must be personally advised of his or her right to a jury trial and must personally waive that right. (*Blackburn*, *supra*, at p. 1116.) The language of section 2972 is unambiguous, directing that the authority to waive a jury trial rests principally with the defendant, *not* defense counsel. "If the Legislature had intended to allow counsel to waive a jury trial notwithstanding the defendant's wishes, it would not have needed to require the trial court to expressly advise the defendant." (*Blackburn*, *supra*, at p. 1125.) It is only where there is substantial evidence the defendant lacks the capacity to make a knowing and voluntary waiver that defendant's counsel will control the waiver decision, even over the defendant's objection. (*Id*. at pp. 1116, 1130.)

---

[3] In cases where the MDO refuses or is unable to sign the form, defense counsel must inform the court, in writing, that the report and the form "were explained to the person and the person refused or was unable to sign the form." (§ 2972.1, subd. (c)(2).)

The remedy for denying an MDO defendant the right to a jury trial is "automatic reversal." (*Id.* at p. 1136.)

Like section 2972, section 2972.1 provides that the person who had previously been placed on outpatient status is empowered to waive a trial by jury.[4] (§ 2972.1, subd. (d).) Pursuant to *Blackburn*, *supra*, 61 Cal.4th at pages 1116 and 1130, that power will devolve to the person's counsel only where substantial evidence shows the person is incapable of making a knowing and voluntary waiver.

Therefore under the plain language of section 2972.1 and the analysis set forth in *Blackburn*, Presley was entitled to a jury trial on the question of his outpatient status, and we agree that the trial court erred in not setting the matter for such a trial without first obtaining the written waiver required under the statute. In ordinary circumstances, we would be inclined to also agree with Presley that this error mandates reversal. We cannot do so here because Presley has forfeited this claim of error by absconding before any decision was made on his commitment status.

### 3. *Presley forfeited his right to a jury trial by absconding*

Once Presley went AWOL, Dr. Suzuki withdrew his prior assessment that Presley did not meet the MDO criteria and instead recommended that the trial court revoke Presley's outpatient status. At this point, whether Presley still qualified as an MDO and whether his outpatient status should be renewed became moot. Though our research has disclosed no case involving a person who deliberately absented himself from proceedings on his MDO status, there are multiple cases holding that a fugitive from justice is not permitted to, for example, invoke his constitutional right to a speedy trial and thus avoid

---

[4] Unlike section 2972, subdivision (a), which states that "trial shall be by jury unless waived by both the person and the district attorney," section 2972.1 requires that both the person *and defense counsel* must indicate, in writing, whether they demand a jury trial on the recommendation. The additional requirement that defense counsel be a part of the waiver decision under section 2972.1 does not alter the conclusion that the decision itself remains principally within the sole control of the person.

criminal proceedings. (See, e.g., *In re Gere* (1923) 64 Cal.App. 418, 422-423; *People v. Anderson* (1954) 126 Cal.App.2d 702, 704; *People v. Seely* (1946) 75 Cal.App.2d 525, 526-527; *People v. Perez* (1991) 229 Cal.App.3d 302, 309.) The maxim of jurisprudence that "No man can take advantage of his own wrong" precludes Presley from complaining of error in the proceedings below when he voluntarily elected not to attend those proceedings.

Presley's act of absconding also means he cannot claim to have been prejudiced by the trial court's error. It was not reasonably probable that it would have changed the outcome had the trial court scheduled a jury trial. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837; *People v. Breverman* (1998) 19 Cal.4th 142, 165 [*Watson* standard of review applicable to errors of state law].) Presley had already absconded by the time a jury trial would have been held. Assuming he appeared for that trial, Dr. Suzuki's testimony about him leaving his family home and refusing to let CONREP staff know where he could be reached would have fatally undercut any claim on his part that he would comply with his treatment plan and do whatever else was required to keep his mental illness in remission going forward.

Accordingly, we find no basis for reversing the trial court's orders due to the failure to set a jury trial.

### B. *No error in revoking Presley's outpatient status in his absence*

Presley next argues the trial court erred when it held a hearing to revoke his outpatient treatment status and recommit him to the state hospital in his absence. We disagree.

#### 1. *Relevant statutes and principles of statutory interpretation*

Proceedings to revoke an MDO's outpatient treatment status may be initiated by either the community program director (§ 1608) or by the prosecutor (§ 1609).

Section 1608 provides, in relevant part: "If at any time during the outpatient period, the *outpatient treatment supervisor* is of the opinion that the person requires

10

extended inpatient treatment or refuses to accept further outpatient treatment and supervision, the community program director shall notify the superior court . . . of such opinion by means of a written request for revocation of outpatient status. . . . [¶] *Within 15 judicial days*, the court where the request was filed shall hold a hearing and shall either approve or disapprove the request for revocation of outpatient status." (Italics added.)

Section 1609 provides, as follows: "If at any time during the outpatient period or placement with a local mental health program . . . *the prosecutor* is of the opinion that the person is a danger to the health and safety of others while on that status, *the prosecutor* may petition the court for a hearing to determine whether the person shall be continued on that status. Upon receipt of the petition, the court shall calendar the case for further proceedings within 15 judicial days and the clerk shall notify *the person*, the community program director, and the attorney of record for the person of the hearing date. Upon failure of the person to appear as noticed, . . . the court may issue a body attachment for such person. If, after a hearing in court conducted using the same standards used in conducting probation revocation hearings pursuant to Section 1203.2, the judge determines that the person is a danger to the health and safety of others, the court shall order that the person be confined in a state hospital or other treatment facility which has been approved by the community program director." (Italics added.)

" 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language." (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) "When the Legislature uses materially different language in statutory provisions addressing the same

11

subject or related subjects, the normal inference is that the Legislature intended a difference in meaning." (*People v. Trevino* (2001) 26 Cal.4th 237, 242.)

> 2. *Analysis*

In this case, the revocation proceedings were triggered by Dr. Suzuki's request pursuant to section 1608 that the trial court revoke Presley's outpatient status after he absconded from CONREP. The plain language of that statute neither precludes the court from proceeding in the person's absence, nor does it require that the person receive notice of the hearing. It is therefore reasonable to infer that there is no requirement that the person be present at the hearing.

The language of section 1608 is quite different from that in section 1609, which describes the mechanism by which the People can initiate revocation proceedings. Section 1609 expressly requires notice to the person, not just their counsel, of the revocation hearing date. The statute further authorizes the court to issue a body attachment if the person fails to appear for that hearing. No such language appears in section 1608. Given that the Legislature elected to use materially different language in two statutes addressing the same subject matter gives rise to the inference that the Legislature intended "a difference in meaning." (*People v. Trevino*, *supra*, 26 Cal.4th at p. 242.)

In this case, the trial court did not err by proceeding in Presley's absence because he had absconded from his outpatient program. Presley missed at least four sessions in which he was required to meet with either Dr. Suzuki or someone on his staff. Furthermore, even after Dr. Suzuki formally requested revocation of Presley's outpatient status, he or members of his staff were in contact with Presley on two occasions. On October 6, 2014, Presley met with staff and provided a urine sample. On October 10, 2014, Dr. Suzuki spoke to Presley by telephone, asking him to stop by the CONREP facility the following Monday as well as requesting an address and phone number where he could be reached. During that telephone conversation, Dr. Suzuki advised Presley a

hearing was scheduled for October 15 and told him he would help arrange transport to the hearing. When Dr. Suzuki asked Presley about his noncompliance with the program, Presley offered no explanation and failed to appear at the CONREP facility the following Monday as promised.

Just as Presley forfeited his right to object to the trial court's failure to set a jury trial on the question of his outpatient status, his absconding from CONREP similarly amounts to a forfeiture of his right to complain that the trial court proceeded in his absence. He was present at the August 29 hearing and was aware the question of his outpatient status was not resolved, yet he elected to leave his family home, without his antipsychotic medication, and refused to provide CONREP with an address and telephone number where he could be reached.

C.      No error in allowing Dr. Suzuki to testify about what Presley's mother told him

Presley argues the trial court violated his due process right to confront and cross-examine adverse witnesses by permitting Dr. Suzuki to testify as to certain statements made to him by Presley's mother, without a showing of good cause.

After briefing was completed in this case, the California Supreme Court issued its decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) which addressed the circumstances under which hearsay statements proffered by expert witnesses in criminal proceedings[5] may be found to violate the Confrontation Clause. In an abundance of caution, we requested supplemental briefing from the parties on the following questions, assuming the analysis set forth in *Sanchez* is applicable to this case: (1) Did Presley forfeit his Confrontation Clause challenge by failing to assert it below; (2) Assuming he did not, were the statements made to Dr. Suzuki by Presley's mother inadmissible as

_____

[5] In *Sanchez*, the California Supreme Court acknowledged that the rule pronounced by the United States Supreme Court in *Crawford v. Washington* (2004) 541 U.S. 36 regarding the Sixth Amendment right to confrontation "has not been extended to civil proceedings." (*Sanchez, supra*, 63 Cal.4th at p. 680, fn. 6.)

"testimonial," in light of *Sanchez* and *Ohio v. Clark* (2015) 576 U.S. __ [135 S.Ct. 2173] [U.S. Lexis 4060]; and (3) Assuming the statements were inadmissible, was their admission harmless beyond a reasonable doubt?

Having received and reviewed the briefing filed by the parties, we agree that *Sanchez* is not applicable to MDO proceedings,[6] but rather, any purported violation of Presley's confrontation rights must be analyzed as a violation of his due process rights under the Fourteenth Amendment to the United States Constitution as discussed in *People v. Arreola* (1994) 7 Cal.4th 1144 (*Arreola*). As discussed below, we conclude that Presley's due process rights were not violated by allowing Dr. Suzuki to testify as to what Presley's mother told him. Even if they were, however, Presley was not prejudiced by any such violation.

### 1.    *Relevant background*

During the October 15, 2014 revocation hearing, defense counsel objected to Dr. Suzuki testifying about various statements made to him by Presley's mother on, among other grounds, hearsay.

Dr. Suzuki testified that, after a telephone conversation with Presley's mother on September 29, 2014, he went to her home and confirmed that Presley had moved out. Presley's mother, who took him to the pharmacy to pick up his prescriptions, told Dr. Suzuki that his Zyprexa refill was not picked up when they picked up his other medications.

Presley's mother also told Dr. Suzuki she had walked in on Presley's girlfriend snorting methamphetamine and told her to leave. Presley left with his girlfriend. According to Presley's mother, Presley had stopped paying rent to her, but was giving that money to his girlfriend for drugs instead. Presley's mother said this girlfriend was

_____

[6] Accordingly, we do not further address *Sanchez* or analyze the Sixth Amendment right to confrontation in this opinion.

14

the "same girlfriend from before that [Presley] beat up." Dr. Suzuki checked with the payee charged with distributing Presley's disability benefits and learned that Presley had recently asked to receive his benefits in cash.

Dr. Suzuki concluded Presley's outpatient status should be revoked based on "[t]he risk factors I mentioned, the schizophrenia being untreated, being with the significant other of previous domestic violence incident, not complying with the supervision and the AWOL behavior all point to the level of impulsivity he displayed despite the one year of outpatient treatment."

### 2. *Legal principles*

An expert witness may generally base his or her opinion on any matter known to the expert which may "reasonably . . . be relied upon" for that purpose. (Evid. Code, § 801, subd. (b).) Furthermore, Evidence Code section 802 provides: "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." If an out-of-court statement is admitted for a purpose other than the truth of the matter asserted, the credibility of the hearsay declarant is not at issue and therefore cross-examination of the declarant is less important. (*People v. Cooper* (2007) 148 Cal.App.4th 731, 747.)

Under section 1609, the hearing for revocation of outpatient status is to be "conducted using the same standards used in conducting probation revocation hearings pursuant to Section 1203.2." Our state Supreme Court discussed the procedural guidelines governing probation revocation hearings in *Arreola*, *supra*, 7 Cal.4th at pages 1152 through 1153. The court stated: "The pertinent California statute—Penal Code section 1203.2—prescribes few procedural guidelines governing probation revocation proceedings. The two seminal United States Supreme Court decisions, however,— *Morrissey v. Brewer* [(1972)] 408 U.S. 471, and *Gagnon v. Scarpelli* [(1973)] 411 U.S. 778—set forth the procedural safeguards required by the federal Constitution for

15

revocation proceedings. In 1972, in *Morrissey*, the high court defined the minimal due process requirements for parole revocation, recognizing that parolees enjoy a 'conditional liberty' requiring constitutional protection (408 U.S. at p. 484), and that both the parolee and society have a stake 'in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole . . . .' " (*Arreola*, *supra*, at p. 1152, fn. omitted.)

Hearsay evidence may be used at probation revocation hearings if it bears a substantial degree of trustworthiness. (*Morrissey v. Brewer*, *supra*, 408 U.S. at p. 489.) The determination of trustworthiness rests within the discretion of the trial court. (*People v. Brown* (1989) 215 Cal.App.3d 452, 454-455.) "A trial court's decision to admit or exclude evidence in a probation revocation hearing will not be disturbed on appeal absent an abuse of discretion." (*People v. Shepherd* (2007) 151 Cal.App.4th 1193, 1197-1198.)

With respect to hearsay evidence to replace the live testimony of a witness, such evidence is inadmissible absent a showing of good cause. (*Arreola*, *supra*, 7 Cal.4th at p. 1159; *People v. Winson* (1981) 29 Cal.3d 711, 713-714.) Good cause is shown where: (1) the declarant is unavailable under the traditional hearsay standard of Evidence Code section 240; (2) the declarant, although not legally unavailable, can only be brought to the hearing through great difficulty or expense, or (3) the declarant's presence would pose a risk of harm to the declarant. (*Arreola*, *supra*, at p. 1160.)

However, where the statements at issue either fall under an exception to the hearsay rule or are admitted for a nonhearsay purpose, showing good cause is not required. (*People v. Stanphill* (2009) 170 Cal.App.4th 61, 81.)

### 3.	*Analysis*

In this case, the trial court made no finding of good cause in relation to the statements made by Presley's mother. However, it is clear that those statements were admitted for the nonhearsay purpose of explaining Dr. Suzuki's investigation into Presley's compliance or noncompliance with his outpatient treatment plan.

16

After Presley's mother told him Presley had left the family home, Dr. Suzuki personally went to her house and confirmed that Presley no longer resided there. During that home visit, Dr. Suzuki went into the room that Presley had been living in to collect any prescription medications Presley left behind and learned that Presley had failed to take or renew his antipsychotic prescription. Dr. Suzuki had personal knowledge that Presley was not making or keeping appointments with CONREP as required under his treatment plan. Finally, Dr. Suzuki spoke with Presley on the phone a few days before the hearing. In that conversation, Presley admitted he was no longer living at his mother's house, but would not tell CONREP where he was now staying.

Dr. Suzuki's conclusions were based on his personal investigation of the facts relating to Presley's noncompliance with outpatient treatment. The statements by Presley's mother may have prompted Dr. Suzuki's investigation, but they were not the *basis* for his opinion that Presley was no longer complying with his treatment program and that his outpatient status should be revoked.

### D. *Substantial evidence supported revocation decision*

Presley argues there was insufficient evidence, assuming the hearsay evidence proffered by Dr. Suzuki is deemed inadmissible, to support the trial court's decision to revoke his outpatient treatment.

In determining the sufficiency of the evidence, the reviewing court "must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) " 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576, quoting *People v.*

17

*Reilly* (1970) 3 Cal.3d 421, 425.) Reversal on the basis of insufficient evidence is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conclusion of the trier of fact]." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Dr. Suzuki testified, based on personal knowledge, about how Presley was not compliant with his outpatient treatment program. Presley left the family home approved by CONREP and refused to provide a new address or telephone number where he could be reached. Dr. Suzuki concluded, based on what he observed in Presley's room, that Presley had stopped taking his antipsychotic medication. Dr. Suzuki noted that Presley's various "risk factors," consistent with his untreated schizophrenia pointed to a "level of impulsivity he displayed despite the one year of outpatient treatment."

Presley argues the doctor could have done more than inspect his medication bottles to determine whether he was not taking his medication. He also claims Dr. Suzuki could have investigated whether Presley was, in fact, with his former girlfriend, or that he was giving that girlfriend money for illegal drugs. Again, we are not concerned, at this stage of the proceedings, whether the evidence presented below established Presley's noncompliance with his treatment program beyond a reasonable doubt. It is sufficient that the evidence in support of the trial court's conclusions is substantial, i.e., that it is "evidence that is reasonable, credible and of solid value." (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1053.) The evidence presented to the court below met those criteria.

## III. DISPOSITION

The order revoking Presley's outpatient status is affirmed.

18

_____

Premo, J.

WE CONCUR:

_____

Rushing, P.J.

_____

Grover, J.

People v. Presley
H041651

| Trial Court: | Monterey County Superior Court<br>Superior Court No. SS051124A |
|---|---|
| Trial Judge: | Hon. Julie R. Culver |
| Counsel for Plaintiff/Respondent:<br>The People | Kamala D. Harris<br>Attorney General<br><br>Gerald A. Engler<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence<br>Acting Senior Assistant Attorney General<br><br>Catherine A. Rivlin<br>Supervising Deputy Attorney General<br><br>Karen Z. Bovarnick<br>Deputy Attorney General |
| Counsel for Defendant/Appellant:<br>Ecclesiastes Presley | Under appointment by the Court of Appeal<br>Julia Freis |

People v. Presley
H041651